Vincent D. DIFELICE, on behalf of himself and all others similarly situated, Plaintiff,

v.

US AIRWAYS, INC., Defendant.

No. 1:04 CV 889.

United States District Court, E.D. Virginia. Alexandria Division.

June 26, 2006.

Stephen Ray Pickard, Alexandria, VA, for Plaintiff.

Charles C. Jackson, Christopher A. Weals, Christine Bannon Cox, Hana Fran Brilliant, Karen Ellen Gray, Amy Covert, Morgan Lewis & Bockius LLP, Washington, DC, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This breach of fiduciary duty action brought against U.S. Airways, Inc. ("US Airways" or "the Company") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., concerns the standard a prudent fiduciary must meet when considering whether to retain as an investment option in a defined contribution 401(k)[1] retirement plan an investment consisting primarily of company stock when the company is in financial distress.

This action was originally filed by Vincent D. DiFelice, a plan participant, on behalf of a class of plan participants, against U.S. Airways and Fidelity Management Trust Company ("Fidelity"), the

directed trustee of the 401(k) plan at issue, for breach of their respective fiduciary duties.[2] Fidelity's threshold motion to dismiss was granted on September 27, 2005. See DiFelice v. U.S. Airways, Inc., 397 F.Supp.2d 735 (E.D.Va.2005) [Hereinafter DiFelice I]. Thereafter, plaintiff and U.S. Airways conducted extensive interrogatory, document and deposition discovery, following which U.S. Airways filed a motion for summary judgment. After briefing and oral argument, U.S. Airways' motion was granted in part and denied in part. It was granted with respect to the claim that U.S. Airways failed to provide complete and accurate information to Plan participants and denied with respect to the claim that U.S. Airways failed to exercise prudently its discretion to select and retain investment options for the retirement plan at issue. See DiFelice v. U.S. Airways, Inc., 397 F.Supp.2d 758 (E.D.Va.2005) [Hereinafter DiFelice II]. Also during the discovery, plaintiff successfully sought certification of a class. Specifically, plaintiff's motion for class certification was granted on March 22, 2006, resulting in the certification of the following class:

> All participants and their beneficiaries in the U.S. Airways, Inc. 401(k) Savings Plan (the "Plan") for whose accounts the fiduciaries of the Plan acquired or held units of the U.S. Airways Group, Inc. Common Stock Fund at any time between October 1, 2001 and June 27, 2002.

See DiFelice v. U.S. Airways, 235 F.R.D. 70, 83 (E.D.Va.2006).

The sole issue remaining following discovery and summary judgment proceedings was whether U.S. Airways breached its fiduciary duty under ERISA by allow-

---

1. See 26 U.S.C. § 401(k)

2. Plaintiff filed a separate action against the independent fiduciary, A on Fiduciary Counselors, Inc. ("Fiduciary Counselors"), appointed by U.S. Airways to assume some of its

fiduciary duties in May 2002. Fiduciary Counselor's motion to dismiss was granted on November 8, 2005. See DiFelice v. Fiduciary Counselors, Inc., 398 F.Supp.2d 453 (E.D.Va. 2005).

ing the stock of U.S. Airways' parent corporation U.S. Airways Group, Inc. ("Group"), to remain as a plan investment option during the class period despite the Company's and concomitantly Group's precarious financial condition. This issue was then the focus of a six day bench trial in the course of which 18 witnesses testified, either live or by video deposition. Plaintiff presented 11 fact witnesses and 5 experts, and U.S. Airways presented 2 expert witnesses.[3] Additionally, the trial record also included cross-designated portions of the depositions of ten additional witnesses, as well as a total of approximately 200 documentary exhibits. Based on this voluminous record and the parties' written and oral arguments, the Court issues the following findings of fact and conclusions of law, pursuant to Rule 52, Fed.R.Civ.P.

## I. FINDINGS OF FACT

### A. Introduction

1. This ERISA case involves an alleged breach of fiduciary duty by defendant U.S. Airways in offering and retaining the U.S. Airways Group, Inc. Common Stock Fund (the "Company Stock Fund") as an investment option for the U.S. Airways, Inc. 401(k) Savings Plan (the "Plan") during the period October 1, 2001 to June 27, 2002 ("the class period").

2. US Airways, a Delaware Corporation headquartered in Arlington, Virginia, is a certified air carrier engaged in the business of transporting passengers, property and mail primarily in the northeastern United States and Florida. It is the principal operating subsidiary of Group.

3. During the class period, Group's shares were publicly traded on the New York Stock Exchange. At all times during the class period, the Company Stock Fund was composed primarily of the publicly traded

---

**3.** Plaintiff's fact witnesses included: (1) David Siegel, the Company's Chief Executive Officer from March 6, 2002 through the end of the class period; (2) Thomas Mutryn, the Company's Senior Vice President Finance and Chief Financial Officer from before the beginning of the class period until April 8, 2002; (3) Ellen Hennessy, the President and CEO of Fiduciary Counselors; (4) Michele Bryan, U.S. Airways' Senior Vice President Human Resources until April 2002 when she became U.S. Airways' Executive Vice President Corporate Affairs and General Counsel; (5) Mathias DeVito, a member of U.S. Airways' Board of Director's and Chairman of the Board's Human Resources Committee throughout the class period; (6) Stephen Wolf, Chairman of U.S. Airways' Board of Directors at all times during the class period and CEO from November 27, 2001 through March 6, 2002; (7) Vincent DiFelice, the named plaintiff and a Plan participant; (8) Rakesh Gangwal, U.S. Airways' CEO until from February 19, 1996 through November 26, 2001; (9) Jennifer McGarey, U.S. Airways' Vice President, Deputy General Counsel and Corporate Secretary; (10) Neal Cohen, U.S. Airways' Executive Vice President and Chief Financial Officer after April 8, 2002; and (11) Ben Baldanza, U.S. Airways' Senior Vice President Marketing and Planning. Plaintiff's expert witnesses included: (1) Edward Altman, a Professor of Finance and expert on the prediction of bankruptcy; (2) Jeffrey Miller, an expert on equities trading; (3) C. Frederick Reish, an attorney specializing in employee benefit law; (4) Helen Peters, former dean of Boston College's Carroll School of Management and an expert in investment management; (5) and Mark Gleason, a Certified Public Accountant and damages expert. US Airways' expert witnesses included: (1) John Peavy, an expert in investment management; and (2) Lassaad Turki, a damages expert.

US Airways found it unnecessary to call any fact witnesses because plaintiff elected to call many of the Company executives who were involved in the events in issue and had knowledge of the pertinent facts.

Group shares and the remainder in cash.

4. Plaintiff Vincent D. DiFelice, a citizen of Pennsylvania, has been employed by U.S. Airways as an aircraft mechanic since January 3, 1990. He was a participant in the Plan throughout the class period, and at certain times during the class period, he invested a significant percentage of his 401(k) account in the Company Stock Fund.

## B. The U.S. Airways 401(k) Plan

### 1. The Plan

5. At all relevant times, U.S. Airways maintained a defined contribution plan[4] under Section 401(k) of the Internal Revenue Code of 1986, 26 U.S.C. § 401(k), for the benefit of its employees covered by certain bargaining agreements, including flight attendants represented by the Association of Flight Attendants, and mechanics represented by the International Association of Machinists and Aerospace Workers.

6. The relevant documents governing the Plan consisted of the U.S. Airways, Inc. 401(k) Savings Plan, as amended, and the Trust Agreement for U.S. Air, Inc. 401(k) Savings Plan which is incorporated by reference. The Company also provided participants with several documents describing their rights and obligations under the Plan in greater detail, including the Summary Plan Description ("SPD"), and several investment brochures describing the Plan's investment options. As the Plan documents reflect, the Plan's stated purpose was "to provide retirement income" to the participants. The Plan documents also stated that the Plan was "intended to operate for the exclusive benefit of eligible employees and their beneficiaries."

7. The Plan was a participant-directed defined contribution plan that provides an individual account for each participant. Each participant's benefit was based solely on the value of his or her individual account, *i.e.*, the contributions to the account plus any earnings and less any losses or allocated expenses.

8. The Plan permitted participants to contribute up to 15% of their salaries to the Plan on a pre-tax basis. In addition to a participant's contributions, U.S. Airways matched the contributions of certain employees up to a specified level. These matching contributions could not be invested in the Company Stock Fund.

9. The Plan provided: "The Company shall enter into a Trust Agreement with a Trustee, setting forth the terms, provisions, and conditions pursuant to which the Trustee shall hold, manage and administer all assets of the Plan in Trust." The Plan further provided: "The terms and provisions of the Trust Agreement are hereby incorporated into the Plan by reference." Pursuant to these provisions, the Company entered into a Trust Agreement with Fidelity dated January 1, 1993. Fidelity remained the directed trustee of the Plan throughout the entire class period.

---

4. Unlike defined benefit plans, which promise a set benefit upon participants' retirement, a defined contribution plan's benefits are based on the amount contributed plus any income, gains or losses. *See* 29 U.S.C. §§ 1002(34) and (35) (defining a "defined contribution plan" and a "defined benefit plan" respectively).

10. Consistent with the Plan, the Trust Agreement states that the Trust was established "for the exclusive benefit of employees and their beneficiaries...."

### 2. US Airways' Responsibilities Under the Plan

11. The Plan designated U.S. Airways as the administrator of the Plan for purposes of ERISA and the Internal Revenue Code. Particularly pertinent here is the Plan provision designating U.S. Airways as a named fiduciary with the authority "to employ such attorneys, agents, and accountants as it may deem necessary or advisable to assist in carrying out its duties hereunder ...."

12. The Plan granted U.S. Airways the discretionary authority to select or remove alternative investment funds.[5]

13. Neither the Plan nor the Trust Agreement mandated the offering of the Company Stock Fund as an investment alternative. Instead, this was left to U.S. Airways' discretion, the Plan stating that "[t]he Company may, in its discretion, terminate any Investment Manager and any Investment Fund." Likewise, the Trust Agreement stated, "Investment vehicles which the Company may select shall be limited to any investment options set forth in Schedule C that may be attached to and made part of this Agreement ...." Schedule C to the

Trust Agreement stated during the class period: "The Company may select as investment vehicles only from among the following investment options: .... (vi) employer securities issued by USAir Group, Inc."

14. The Trust Agreement stated: "Any investment by the Trustee in employer securities shall be made in accordance with the provisions of Article VIII." Article VIII, in turn, provided that Trust investments in employer securities shall be made via the Company Stock Fund. Further, Section 8.3 of the Trust Agreement, entitled "Fiduciary Responsibility for Investment in Company Stock," stated that: "The Company shall continually monitor the suitability under the fiduciary duty rules of Section 404(a)(1) of ERISA (as modified by Section 404(a)(2)) of acquiring and holding Company Stock."

### 3. The Pension Investment Committee

15. In accordance with the terms of the Plan, U.S. Airways delegated the authority to select, monitor, and terminate investment options under the Plan to the Pension Investment Committee ("PIC"). The PIC reported to the Human Resources Committee of the Board of Directors (the "HR Committee"), which in turn reported to the full Board of Directors.

16. The PIC had the responsibility and authority to make decisions regard-

5. Specifically, the Plan states: "The Company shall determine the number and type of Investment Funds and select the investments for such Investment Funds .... Each Investment Fund shall be held and administered as a separate, common trust fund. The interest of each Participant or Beneficiary under the Plan in an Investment Funds shall be an undivided interest." Similarly, the Trust Agreement provided that "the Company shall direct the Trustee [Fidelity] in writing to establish and invest the assets of the Trust in separate Investment Funds."

ing investment policy and investment options offered with respect to the Plan, as well as the responsibility and authority to monitor the prudence of investment options.

17. During the class period, the following persons were members of the PIC: Ben Baldanza, Senior Vice President—Marketing & Planning; Michelle Bryan, Executive Vice President—Corporate Affairs and General Counsel and Senior Vice President—Human Resources; Neal Cohen, Executive Vice President and Chief Financial Officer; and Thomas Mutryn, Senior Vice President—Finance and Chief Financial Officer. Ben Baldanza served as a member of the PIC during the entire class period. Michelle Bryan also served on the PIC throughout the class period. Thomas Mutryn served as a member of the PIC from the beginning of the class period until on or about April 8, 2002. Neal Cohen then replaced Thomas Mutryn and served on the PIC from April 8, 2002 until at least the end of the class period. All of these officers had significant experience in the airline industry and, as part of their responsibilities with the Company, they were all well aware on a daily basis of U.S. Airways' business and financial situation.

18. The PIC met on a regular basis to review the performance of investment options provided in the Plan, and to consult with financial advisors. During the class period, the PIC formally met on four dates: November 16, 2001; December 12, 2001; January 22, 2002; and June 3, 2002. The PIC also met informally on various other occasions during the class period. These informal meetings of the PIC became more frequent as the Company focused on successfully completing its voluntary restructuring plan in May 2002.

19. The Treasurer of the Company, Jeff McDougle, the Director of Pension Investments, Janice Emery, the Assistant General Counsel, Jennifer McGarey, and outside investment consultants also attended PIC meetings for the purpose of providing PIC members advice and information relevant to Plan investments.

20. Prior to PIC meetings, Janice Emery, Director of Pensions, typically circulated an agenda and various written materials to the members, including reports, summaries, and other documents covering such subjects as employee participation rates in the Plan, the performance of funds offered in the Plan, general market trends, asset allocation among funds, the holdings of the Company Stock Fund as a percentage of total market capitalization, the risk and reward characteristics of the funds, the number of participants invested only in the company Stock Fund, and other data. Among the reports PIC members considered were the U.S. Airways Defined Contribution Plans Quarterly Performance Reports prepared by the Company's outside consultants. PIC members also received general background information and news articles, and reviewed financial reports that were presented during the Board of Directors meetings, as well as internal reports of the Company's financial performance.

21. During its meetings, the PIC also reviewed the Company Stock Fund

in conjunction with its review of all investment options in the defined contribution plans. As senior executives of the Company, PIC members were well aware on a daily basis of Group's stock price and were therefore also aware of the Company Stock Fund's performance. Additionally, Mr. Mutryn reviewed Wall Street estimates and investment analyst recommendations regarding Group's shares.

22. In addition to its regular meetings, the PIC also reported to the HR Committee twice a year. These reports covered a range of subjects relating to the Company's defined contribution and defined benefit plans and the PIC's activities. These reports typically included a slide presentation and/or written materials. Included in the PIC's reports to the HR Committee were data on the market value of the Company Stock Fund and the percentage of Plan assets held in the Company Stock Fund.

### 4. The Plan Investment Options and the Company Stock Fund

23. In addition to the Company Stock Fund, the investment options available to Plan participants at all times during the class period included the following investment funds: Fidelity Magellan, Fidelity Spartan U.S. Equity Index, Fidelity Equity Income, T. Rowe Price Small Cap Stock, Neuberger Berman Guardian Trust, Putnam International Equity, Capital Growth Mix Portfolio, Moderation Mix Portfolio, Income Mix Portfolio, MSIFT U.S. Core Fixed Income, Fixed Income (Stable Value) Fund, and Fidelity Retirement Gov't Money Market.

24. These investment options presented Plan participants with a range of choices along the risk/return spectrum, and therefore allowed participants to construct a portfolio consistent with their investment goals.

25. The Company Stock Fund consisted primarily of Group's publicly traded shares, plus an amount of cash sufficient to satisfy the Fund's needs for transfers and payments. In this regard, the Trust Agreement specifically stated that the Company Stock Fund would consist of Group stock and short-term liquid investments "necessary to satisfy the Fund's cash needs for transfers and payments." During the class period, U.S. Airways had discretion to determine the percentage mix between Group stock and cash in the Company Stock Fund, and at all relevant times directed the Trustee to keep approximately 10% of the Company Stock Fund in cash.

26. Participants' investments in the Company Stock Fund were limited to "units of participation" in the whole fund, rather than shares of Group stock, with such units representing a proportionate interest in all of the assets of the Fund. Because the Company Stock Fund consisted primarily of shares of Group's common stock, the performance of the Company Stock Fund correlated closely with the performance of Group shares. And because the Company Stock Fund had a 10% cash component, the Company Stock Fund was a less risky investment than owning Group shares outright. For the same reason, any increase in the percentage of the Fund's cash component would decrease the risk as-

sociated with an investment in the Company Stock Fund.

27. The unit price for the Company Stock Fund at the start of the class period on October 1, 2001 was $7.99. The unit price for the Company Stock Fund at the close of the class period on June 27, 2002 was $7.02. During this period, the unit price ranged from a high of $14.53 to a low of $5.43.

5. *The Participants' Authority Under the Plan*

28. While the Plan delegated to U.S. Airways the authority to select and maintain the pool of available investment options, it specifically delegated to the Plan participants the authority to select one or more of these available options in which to invest their account assets. Thus, during the class period, the Plan allowed participants to allocate their Plan account assets among 13 different investment options, including a money market fund, a fixed income fund, various mutual funds, several diversified portfolio funds, and the Company Stock Fund.[6] Participants alone decided how much money to contribute to their Plan accounts (within certain legal limits) and how much money to invest in each investment option.

29. In addition, at any time and without any restrictions, participants could change their investment elections and transfer funds from one investment option to another. Thus, at all times, participants were free to halt contributions to the Company Stock Fund and reallocate prior investments in the Company Stock Fund to other investment alternatives in the Plan.

Further, a participant who exchanged out of the Company Stock Fund could not exchange back into the Company Stock Fund for 30 calendar days.

6. *US Airways' Disclosures to Participants Concerning Investment Strategy*

30. US Airways delivered to each Plan participant a copy of the SPD describing the various investment options available in the Plan and the mechanics of investing in the Plan.

31. The SPD repeatedly advised participants that they were each individually responsible for directing investments in their account. Significantly, the SPD also advised participants that the Plan was intended to comply with Section 404(c) of ERISA, which protects fiduciaries from liability for complying with participant directions, and explained that participants alone were "responsible for any losses which result from investment elections" they made.

32. Also important, U.S. Airways specifically and repeatedly explained to Plan participants in various publications directed to them, the importance of diversifying their investments among various asset classes with different risk/return profiles, and characterized investments in the Company Stock Fund as "involving more risk" than investments in a diversified fund.

33. For example, in the brochure entitled "More Choices When Considering Your Next Move," which U.S. Airways distributed to all Plan participants in late 1998, U.S. Airways explained that "[w]ith [the Plan's] wide-variety of investment choices, you may create the portfolio—that is, mix of investments—that is right for you based on

---

**6.** *See supra* ¶ 23.

your financial goals, comfort level with risk, and investment time frame."

34. In the same brochure, U.S. Airways also explained that participants should "Mix Your Investments to Lower Your Risks," and further explained that:

Most financial experts recommend that you spend your money among three basic investment types—stocks, bonds and short-term/money market investments. That way, the growth potential of stocks, the income potential of bonds, and the safety of short-term/money market investments can be combined to meet your particular investing goals and minimize your investment risk. If you put your money in two or more investment types, then the poor performance of one investment may be offset by the good performance of other investments. Mixing your investments this way is called "diversifying."

35. In the "Destination Retirement" investment brochure distributed to participants, U.S. Airways again told participants to "Mix Your Investments To Help Lower Risks." US Airways explained to participants that:

If you put all your money into one investment or investment type and it doesn't perform well, then your entire portfolio may not perform well and you may not reach your financial goals .... That's why most financial experts recommend that you spread your money among the three basic investment types—growth, income and preservation of principal .... Mixing your investments this way is called "diversifying." Diversification does not ensure a profit or guarantee against loss.

36. The same brochure explained to participants that:

[y]our Plan offers a range of investment options to choose from. The investment options differ in their objectives, giving you the flexibility to choose investments to match your goals. Some are conservative and relatively low risk; others are aggressive and take more risks in their search for potentially higher gains. You choose how much you contribute and where to invest money.

37. Finally, the Destination Retirement brochure explained to participants that they should "Consider Both Risk and Return" and further explained that:

[i]n choosing your investments, be sure you consider the risks and potential for return associated with each investment. There are two basic types of risk—investment risk and inflation risk. Investment risk is the risk that the value of your investment will go down. Generally, investments with *greater investment risk* (such as stocks) are *less* stable (subject to ups and downs of the stock market)....

38. In addition to these notices and advices, U.S. Airways specifically warned participants about the risks of investing in the Company Stock Fund, telling participants that the Company Stock Fund was not a mutual fund and, therefore, was *not diversified* or managed by a portfolio manager or by Fidelity. Further, U.S. Airways explicitly warned participants that the Company Stock Fund was the highest-risk fund offered under the Plan, and participants were provided charts showing that the Fund was the most volatile Plan investment option, with prior investment returns reflecting a 67% loss in one year, followed by a 211.76% gain the next year.

39. US Airways also warned participants that "[i]nvesting in a non-diversified single stock fund involves more risk than investing in a diversified fund," and that only "[s]omeone who does not rely on this fund for his/her entire portfolio" should invest in the Company Stock Fund. Additionally, U.S. Airways expressly cautioned participants against investing more than 10% of their assets in the stock of a single industry.

40. Finally, the SPD specifically referred to the Company Stock Fund, and reiterated that U.S. Airways and Fidelity "cannot and do not guarantee the performance of the [Company Stock] Fund and have no obligation to compensate for any losses suffered by any participant should any such losses occur."

41. Thus, U.S. Airways provided the participants with considerable instruction about the need to diversify among investments with different risk/return characteristics, and specifically informed participants about the risk/return characteristics of the Company Stock Fund.

### 7. The Modern Portfolio Theory

42. US Airways' advice to Plan participants reflects the sound and generally accepted view in the investment community that diversification among different types of investments is the appropriate way to optimize an investor's overall return while minimizing the investor's aggregate risk. This view is generally referred to as the "modern portfolio theory." The acceptance of the portfolio management theory by the investment community was confirmed by the testimony of plaintiff's experts Dr. Edward Altman and Helen Peters, as well as by the testimony of defendant's expert John Peavy.

43. According to modern portfolio theory, investors appropriately measure risk and return as the combined risk and return profile of a portfolio of investments, and not the risk/return characteristics of an individual security included in the portfolio. Because investment returns on different assets are not perfectly correlated with each other, a portfolio of investments is less risky than the average risk of the individual investments. In fact, seemingly risky securities may be portfolio stabilizers and actually may lower the risk of the overall portfolio. Thus, according to modern portfolio theory, diversification among a variety of assets is an important means to control portfolio risk.

44. The investment options offered within the Plan provided participants the opportunity to minimize their investment risk for a given desired return through diversification. The Plan offered investment options in all major asset classes and each participant was free to allocate his or her employee contributions among the available investment alternatives.

45. As previously mentioned, in addition to the Company Stock Fund, U.S. Airways provided participants in the Plan with twelve different investment options offering varying levels of risk and return characteristics.[7] The Plan offered options with a broad array of investment categories, including money market

---

**7.** *See supra* ¶ 23.

funds, stable value, income, growth and income combined, growth, and higher risk international mutual funds. There was at least one fund for each category type, including the lower risk Fixed Income Fund, the moderate risk Fidelity Equity–Income Fund, and the higher risk Fidelity Magellan and Putnam International Growth funds. Additionally, the Plan's three different pre-selected diversified portfolio mixes—one for lower risk tolerances, one for moderate risk tolerances, and one for high-risk tolerances—provided participants with the ability to select a diversified investment portfolio based on his or her risk preferences. In sum, the Plan's investment options were appropriate and sufficiently diverse to allow participants to choose options to result in a portfolio mix that achieved their individual desired level of risk and return.

## C. The Events of the Class Period

*1. The View from October 1, 2001*

46. Any objective investigation of the prospects of U.S. Airways' business on October 1, 2001, three weeks after the September 11 terrorist attacks, would disclose a company facing serious hurdles, with its long-term success, and indeed viability, in doubt.

47. In the fiscal year prior to the beginning of the class period, U.S. Airways had the highest cost structure of any major airline in the United States airline industry. The airline industry measures its cost in terms of the cost per available seat mile. Group's Form 10–K for the fiscal year ended December 31, 2000 stated as follows: US Airways' unit operating cost, or operating cost per available seat mile (ASM), is one of the highest of all the major domestic air carriers. US Airways' pro forma unit operating cost was 12.72 cents for 2000.... By contrast, Delta reported unit operating costs of 9.30 cents for calendar year 2000, and Southwest reported unit operating costs of 7.73 cents for the same period.

48. While the cost differential between U.S. Airways and other major airline carriers declined slightly in 2001, Group remained by far the highest cost carrier of all major domestic air carriers. Group's Form 10–K for the fiscal year ending December 31, 2001 stated:

US Airways' unit operating cost ... is the highest of all major domestic carriers .... U.S. Airways' unit operating cost was 12.46 cents for 2001 .... By contrast, Delta reported unit operating costs of 10.14 cents for 2001, and Southwest reported unit operating costs of 7.54 cents for the same period.

49. Among the factors contributing to U.S. Airways' high operating costs were the relatively short "stage lengths" of its flights. Stage length is the term used to describe the average distance of an airline's flights. Generally, the cost per mile flown decreases for longer stage lengths.

50. In addition to high costs, U.S. Airways' revenues during and before the class period were negatively affected by the overall economic decline associated with the burst of the dot-com bubble in 2000. This adversely affected U.S. Airways because it relied heavily on business fares.

51. US Airways' revenues were also adversely affected by significant competition from the four low-fare carriers in its markets, including Southwest Airlines, JetBlue, AirTran and

Delta Express. US Airways considered this low-fare competition to be its "foremost competitive threat." As stated in Group's 2001 Form 10–K: The Company considers the growth of low-fare competition and the growing presence of competitors' regional jets in certain of its markets to be its foremost competitive threat. Recent years have seen the entrance and growth of low-fare competitors in many of the markets in which the Company's airline subsidiaries operate. These competitors, based on low costs of operations and low fare structures, include Southwest Airlines Co. (Southwest), AirTran Airways, Inc. and JetBlue Airways as well as a number of smaller start-up air carriers. Southwest has steadily increased operations within the Eastern U.S. since first offering service in this region in late 1993. Delta Air Lines, Inc.'s (Delta) low-fare product, "Delta Express," operates primarily in this region and has grown substantially since its 1996 launch . . . .

52. These difficulties were reflected in U.S. Airways' financial results. For the year ending December 30, 2000, Group recorded a net loss of $166 million before the effect of an accounting change relating to dividend miles, and a net loss of $269 million after the net effect of the accounting change was taken into account. These losses continued throughout the first two quarters of 2001 with Group recording a net loss of $163 million for the first three months of 2001, and a net loss of $24 million in the quarter ended June 30, 2001.

53. US Airways had attempted to address its business problems by entering into a definitive merger agreement, signed on May 23, 2000, with UAL Corporation, United Airlines Inc.'s parent corporation, and Yellow Jacket Acquisition Corp., a subsidiary of UAL Corp. formed for the purpose of the merger. On consummation of the merger, shareholders of Group were to receive $60 per share of Group stock. US Airways expected to benefit substantially from this merger and the resulting synergies from combining the two airlines. The market's initial reaction indicated its considerable confidence in the ability of the two airlines to consummate the merger. On May 23, 2000, the price of Group Stock closed at $26.3125 per share. Following the announcement of the proposed merger, Group Stock closed the next day at $49.00 per share. The proposed merger with UAL was approved by Group's shareholders on October 12, 2000.

54. The tentative merger agreement restricted U.S. Airways from implementing changes to its business model, such as changing its route structure, during the pendency of the merger.

55. On February 7, 2001, while the merger was still pending, the Company's Chairman, Stephen M. Wolf, testified before the Judiciary Committee of the United States Senate, which was holding hearings on airline consolidation. In his prepared testimony before the Senate Judiciary Committee, Chairman Wolf stated as follows: Today I am more concerned than ever about U.S. Airways' status. In today's extremely competitive marketplace, there are only two platforms on which to operate an airline successfully. There is the low-cost, low-fare business model represented by carriers such as AirTran, America West, JetBlue and Southwest, and the mature, full service network carriers such as American, Continental, Delta, Northwest and United. US Airways

is neither, and there is no place for a "neither." This is simply an economic reality.

. . . .

For the 45,000 employees of U.S. Airways and the communities we serve, the status quo is simply not an option.

. . . .

Senators, there are two certainties. One, U.S. Airways does not have the financial wherewithal to become a large network carrier. Two, you cannot shrink an airline to profitability.

56. During his video-taped testimony, Mr. Wolf retreated somewhat from this categorical statement (obviously intended to generate Congressional support for the pending merger), indicating that he had always believed a restructuring would be a possible, but more difficult, solution to the Company's long-term business problems.

57. In his prepared statement to the Senate Judiciary Committee, Mr. Wolf also referenced five other airlines he considered to be of a similar size and nature as U.S. Airways, and indicated that of those five, three had "disappeared completely" and the other two "have gone through multiple bankruptcies." He then added that, while neither of those options is an attractive alternative, "[t]hey are, however, real threats given U.S. Airways' unique position." Given this reality, U.S. Airways' management's focus during this period was on completing the merger with United Airlines.

58. Notwithstanding U.S. Airways' stated reliance on the successful completion of the merger, and Chairman Wolf's testimony to Congress, the Department of Justice ("DOJ") indicated on July 27, 2001 that it intended to file a lawsuit to block the merger. As a result, U.S. Airways and United terminated the proposed merger. At this point, Group shares had fallen in value from their post-announcement highs and closed at $17.26.

59. Immediately after the DOJ blocked the merger, U.S. Airways began working on a restructuring plan that would enable it to compete in the marketplace as a stand-alone airline. The new business plan was designed to streamline the Company's operations by employing smaller aircraft and becoming more of a commuter, or regional carrier.

60. Specifically, on August 15, 2001, the Company announced a three-phase strategic restructuring plan to improve its financial performance. The first phase (which was expected to reduce costs by $439 million) focused on (i) adjusting the Company's route network, (ii) adjusting its capacity both in the aggregate and in particular markets, (iii) joining a global alliance, and (iv) reducing non-labor costs. The second phase involved increasing the number of regional jets flown, and the third phase focused on reducing the Company's labor costs through negotiations with the various unions to eliminate the existing unsupportable wage parity with the four largest carriers.

61. Before any significant progress had been made on the Company's restructuring plan, the Company was dealt a further blow by the terrorist attacks of September 11, 2001. These attacks were devastating to the airline industry and to U.S. Airways in particular. Indeed, in response to the September 11, 2001 attacks, the federal government grounded all civilian aircraft operating in United States airspace for three days. Additionally, the federal government closed Ronald Reagan National Airport, where U.S. Airways had substantial operations, for three

weeks, not reopening until October 4, 2001. Even upon reopening the airport, the government only allowed airlines to reinstate service in stages. As a result, as of March 22, 2002, U.S. Airways was only operating 77% of its pre-September 11 departures from Ronald Reagan National Airport. The government did not permit airlines to return to their pre-September 11 service levels at Reagan National Airport until April 15, 2002.

62. Chairman of the Board, Stephen Wolf was quoted in the press as stating to shareholders at a September 19, 2001 meeting, as follows:

We have never seen such a cataclysmic fall-off in revenue. We have got to get our costs down dramatically—dramatically—if we're going to be here tomorrow.... I want to make perfectly clear that the bad thing that could happed is not filing Chapter 11 bankruptcy. The end bad thing that could happen is the elimination of our company if we don't have the cash to operate.

63. The market's reaction to September 11 was swift and negative, reflecting not only the significant damage to U.S. Airways' business prospects, but also the considerable uncertainty concerning possible further terrorist strikes and the government's response to such attacks.

64. The price for a single share of Group stock dropped nearly 65% from a September 10, 2001 price of $11.62 to a September 27, 2001 price of $4.10. This drop was mirrored in the unit price of the Company Stock Fund which dropped 59%, from $18.04 per unit to $7.38 per unit, over the same period.

65. The bond rating agencies also reacted to U.S. Airways' misfortune. Moody's downgraded the Company's debt on September 14, 2001 from B1 to B2. Historically, 6.23% of companies with a B2 rating default within one year, and 13.70% of companies with a B2 rating default within two years. Standard & Poor's downgraded its rating of the Company's senior secured debt on September 20, 2001 from a "B" rating to a "CCC+" rating. According to Standard & Poor's a "CCC+" rating indicates that the debt is vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation. Furthermore, an obligor with a "CCC" rating is not likely to have the capacity to meet its financial commitments on its obligations in the event of adverse business, financial, or economic conditions.

66. To advance his argument that U.S. Airways was on the cusp of bankruptcy throughout the class period, plaintiff presented the expert testimony of Dr. Edward Altman who has created a family of mathematical models that combine traditional financial statement ratios with a statistical multivariant technique, known as discriminant analysis, to arrive at an overall score to classify and predict a firm's likelihood of going bankrupt. These models are known as the "Altman Z-Score Models." After applying his models to U.S. Airways, Dr. Altman concluded that "US Airways was in severe financial distress over the entire [class] period, and with a very high likelihood of bankruptcy potential, particularly after September 30, 2001."

67. Because it was based almost entirely on Group's historical financial metrics, Dr. Altman's model did not take into account either the possibility that U.S. Airways would be able to re-

structure voluntarily thereby significantly reducing its costs, or the possibility that U.S. Airways would be able to address its liquidity problems by obtaining a federal loan guarantee. Indeed, in this respect, Dr. Altman cited Chrysler Corporation as one of the few examples of a company that was in a similarly distressed situation but was nonetheless able to avoid bankruptcy through assistance from the federal government. In sum, Dr. Altman's models do not take account of future events that might impact the likelihood of bankruptcy. The credit rating agencies do consider these factors, and according to the credible testimony of Nell Hennessy, the President and CEO of Fiduciary Counselors, it is for this reason that fiduciaries typically rely on the credit rating agencies rather than the Altman Z–Score models when assessing the likelihood of bankruptcy.

68. Furthermore, Dr. Altman conceded that investing in high-yield (*i.e.*, very risky) securities as part of a diversified portfolio is appropriate, even for managers of pension plans.

69. Finally, because the impact of the terrorist attacks of September 11, 2001 and U.S. Airways' uncertain business prospects were already reflected in Group's share price, investment analysts were essentially neutral on their outlook for Group shares. Of the eight analysts covering the stock on September 30, 2001, six issued a "Hold" rating, one had a "Buy" rating, and one had an "Underperform" rating. As might be expected, a "Hold" rating indicates that the security will perform in line with the market, a "Buy" rating indicates that the security is predicted to outperform the market and an "Underperform" rating indicates that the security is expected to underperform relative to the market.

2. *US Airways' Response to September 11, 2001*

70. A U.S. Airways Special Bulletin issued to employees on September 24, 2001 described the effect of the attacks, and the steps U.S. Airways' management was forced to take as a result:

The terrorist attacks of Sept. 11 have had a catastrophic effect on the airline industry, and U.S. Airways now finds itself in the position of having to struggle for its very survival. Last week, U.S. Airways announced that it would be forced to reduce its system by 23 percent and cut back its workforce by about 11,000 employees due to the aftermath of these attacks and subsequent war emergency .... This is a desperate situation for our company .... *While bankruptcy is not imminent,* it is not impossible, and none of the tools available to any U.S. business can be ruled out. Everything depends on how quickly our customers return and how quickly we can bring down our costs. (emphasis added).

71. In addition to the cost-cutting measures outlined above, on September 25, 2001, U.S. Airways announced a strategic plan to include converting the equipment used for many of its jet flights to more efficient regional jet and turbo-prop aircraft beginning October 7, 2001. US Airways also announced that in "response to the sharp decline in demand as a result of the events of September 11," the Company would be retiring three types of aircrafts from its fleet, which was projected to result in significant cost savings.

72. US Airways' restructuring plan also included deferring certain capital expenditures and closing several res-

ervation centers, U.S. Airways Club facilities and city ticket offices.

73. In an October 30, 2001 press release disclosing its third quarter results, U.S. Airways commented on its post-September 11 outlook as follows: US Airways and other airlines today face the most significant challenge in the history of our companies. That challenge is being met at U.S. Airways through a series of major initiatives that will position the company to deal with the current economic environment. At the same time, our core structure remains sound and provides a solid foundation for the future.

74. On November 27, 2001, Rakesh Gangwal resigned from his position as CEO of U.S. Airways. The position of CEO was filled on an interim basis by Chairman Wolf while U.S. Airways began its search for a new CEO. In addition to his experience as Chairman of the Board of Directors for U.S. Airways, Mr. Wolf had previously served as the CEO of UAL Corporation and United Airlines, Inc.

75. As noted, the terrorist attacks of September 11, 2001 had a significantly negative impact on U.S. Airways' already tight cash position. US Airways addressed its liquidity problems by borrowing against its few remaining unencumbered aircraft and seeking a grant from the government. In November 2001, U.S. Airways raised $404 million by mortgaging certain aircraft to General Electric. In addition, by December 31, 2001, U.S. Airways had received a grant of approximately $264 million from the federal government under the Air Transportation and System Stabilization Act.

76. US Airways commented on these efforts in a January 17, 2002 press release announcing its year end results:

US Airways has taken difficult yet necessary steps to create a platform from which the company can move forward. We have eliminated unprofitable flying, retired four fleet types substantially improving our operating efficiencies, deferred new aircraft deliveries, consolidated and closed facilities, and sadly, but necessarily, reduced our workforce significantly.

77. Thus, despite reporting a net loss for the year ended December 31, 2001 of $2.177 billion (or $1.170 billion after excluding unusual items), Group still had $1.078 billion in cash, cash equivalents and short-term investments on hand at the end of the year.

78. Group's share price recovered somewhat in response to U.S. Airways' efforts to address the calamity of September 11, reaching a fourth quarter 2001 high of $8.60 per share before ending the 2001 calendar year at $6.34 per share. The unit cost of the Company Stock Fund on December 31, 2001 was $11.08.

3. *The PIC's Reaction and Report to the Human Resources Committee*

79. The PIC's first meeting, after the September 11 attacks, and during the class period, occurred on November 16, 2001. At this meeting, the PIC did not discuss whether to remove the Company Stock Fund as an investment option or to alter its cash to stock ratio.

80. The PIC did discuss the Company Stock Fund at its December 12, 2001 meeting. Associate General Counsel Jennifer McGarey led a discussion regarding U.S. Airways' potential exposure to litigation for retaining the Company Stock Fund in its 401(k) plans. The discussion specifically highlighted the then recently-filed

ERISA suits against Lucent Technologies and Enron, Inc.

81. In considering whether to continue offering the Company Stock Fund as an investment option in the Plan at that time, the PIC considered a number of factors including information contained in the written materials presented to Committee members prior to the meeting. These written materials included copies of articles discussing lawsuits that had been filed against Enron and Lucent in connection with offering company stock as an investment option in their 401(k) plans. One article explained that Lucent matched its employee contributions in company stock and that 42% of the plan's assets were invested in the Lucent stock fund. That article further noted that in the year 2000, 68% of participants who had invested in company stock funds in their retirement plans had over 10% of their assets in the company stock fund, with 18% of these individuals investing over 50% of their account in the company stock fund. Another article noted that 19% of all retirement plan assets were invested in company stock in 2000, and cautioned that "15 to 25% is the maximum you want in company stock." This article further explained that "[e]xacerbating the Enron situation was the fact that the company matched employee 401(k) contributions only in company stock, which employees could not sell until age 50," and that employees were precluded from transferring out of the fund as the stock price tumbled due to an untimely blackout period.

82. The Plan and the Company Stock Fund did not suffer from the problems alleged in the Enron and Lucent lawsuits, as the Plan did not compel participants to invest in Group stock and, in contrast with the Enron and Lucent cases, there could be no allegation of fraud or deception on the part of U.S. Airways. Further, the PIC considered that as of September 30, 2001, only 3.8% of the Plan's assets were invested in the Company Stock Fund and only 2.23% of participants were invested exclusively in the Company Stock Fund. This was in contrast to the heavy concentration of participant investments in Enron and Lucent company stock. Indeed, the percentages of Plan assets invested by participants in the Company Stock Fund considered by the PIC were well below those recommended in the articles discussing the Lucent and Enron lawsuits. For these reasons, the PIC, acting as the ERISA Plan fiduciary, reasonably concluded that the lawsuits against Lucent and Enron did not suggest or require that the Company Stock Fund should be removed as a Plan investment option.

83. As of December 12, 2001, the date of the PIC's second meeting during the class period, Group stock, which at the beginning of the class period traded at $4.48 per share, was trading at $6.64 per share, an increase in value of $2.16, or 48%, since October 1, 2001.

84. At the December 12, 2001 meeting, the PIC requested that Ms. McGarey obtain additional legal advice regarding the continued inclusion of the Company Stock Fund as an investment option under the Plan. Pursuant to the PIC's request, Ms. McGarey contacted outside legal counsel, the late Peter Shinevar of O'Melveny & Myers, LLP, for advice concerning the proper handling of the Company Stock Fund. Mr. Shinevar's advice was then discussed with Stephen Wolf, U.S. Airways' interim CEO, who requested that Mr. Shinevar present his advice in writing.

85. In response to this request, O'Melveny & Myers prepared a memorandum for U.S. Airways wherein it (1) addressed the legal restrictions imposed by ERISA with respect to investment of defined contribution plan assets in employer stock; (2) reviewed two class action lawsuits filed against other corporations as a result of losses suffered by participants who invested plan assets in company stock funds; and (3) discussed proposed legislation that would limit 401(k) plan investments in company stock funds. The O'Melveny memorandum explained that many of the legislative proposals being considered—preventing employee matching contributions from being invested only in company stock or requiring plans to permit employees to trade out of a fund consisting primarily of company stock without restriction—would not affect U.S. Airways' Company Stock Fund because the various U.S. Airways 401(k) plans, including the Plan, already provided participants with the ability to trade out of the Company Stock Fund on a daily basis and did not permit matching contributions to be invested in the Fund.

86. Importantly, the O'Melveny memorandum also explained that the then current case law did not require that a fiduciary must advise participants to sell company stock or cease offering company stock as an investment option merely because the stock has declined in value. The memorandum cited *Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir.1995), explaining that the "Sixth Circuit found no liability [for breach of fiduciary duty] even though the company stock declined from $50 to $10 per share, because the stock price fluctuated significantly (and thus the decline was not predictable) and several investment bankers recommended the stocks during the relevant periods."

87. The O'Melveny memorandum also advised that

except for one company that was about to file for Chapter 11 (*i.e.*, Federal–Mogul), however, we are not aware of any company that has eliminated a Company Stock Fund from its 401(k) plan or even restricted the ability of participants to make new investments in its Company Stock Fund. The best defense against potential liability is a full disclosure of material information about all investment alternatives, including the Company Stock Fund and general advice regarding investment risk.

88. After reviewing the O'Melveny memorandum just prior to the January 15, 2002 Board meeting, the PIC again discussed whether it was prudent to continue offering the Company Stock Fund as an investment under the Plan, and determined that it was prudent to continue offering the Company Stock Fund as an investment option in the Plan.

89. At the HR Committee meeting held on January 15, 2002, which Mr. Mutryn and Ms. Emery also attended, Ms. Bryan reported to the HR Committee that, after considering the O'Melveny memorandum, the PIC had concluded that the Plan could continue offering the Company Stock Fund to participants.[8] The HR Committee

---

8. The minutes of the January 15, 2002 HR Committee meeting reflect Ms. Emery's report that:

in light of the issues that had been raised in the Enron case, the Corporation [US Airways] had requested that its outside legal counsel review any legal issues raised by the inclusion of a common stock fund as an investment option in the defined contribution plans. Ms. Emery noted that based on

discussed outside legal counsel's opinion regarding the Company Stock Fund, and agreed with the PIC's conclusions. The HR Committee also considered the market values and investment performance of the Company's defined contribution plans, and specifically the Company Stock Fund. In addition, the HR Committee specifically considered the percentage of all Group shares outstanding held by the Company Stock Fund and the percentage of defined contribution assets and total pension assets represented by the Company Stock Fund.[9]

90. Thereafter, at the January 16, 2002, Board of Directors meeting (which was also attended by Ms. Bryan and Mr. Mutryn), Mathias De-Vito, Chairman of the HR Committee, reported to the full Board, as reflected in the minutes, that the Company's

outside legal counsel had reviewed the legal issues associated with offering the [Company Stock Fund] as an investment option offered under the Corporation's 401(k) plans in light of the Enron issues and determined that there were not any legal issues involved with offering the Common Stock Fund.

The Board of Directors accepted this representation and accordingly took no action with respect to the Company Stock Fund.

91. Thus, the record reflects that as of January 2002, the PIC and the Board of Directors had fully considered whether to continue to offer the Company Stock Fund as a Plan investment option and had determined, based largely on the advice of outside legal counsel, that retaining the Company Stock Fund was not a breach of its fiduciary duty.

### 4. New Leadership and the "Dual Path" Approach

92. US Airways began fiscal year 2002 with decidedly mixed prospects. Although the Company disclosed in its Form 8–K filing announcing its results for fiscal year 2001 that it expected its operating cash flow to be negative $3 million per day through the first quarter of 2002, it also disclosed its expectation that operating cash flow would turn positive in April 2002 as the Company entered a stronger seasonal quarter, the effects of September 11, 2001 dissipated, and the Company's cost-cutting measures began to bear fruit.

93. This guidance to the investment community was consistent with the internal projections presented to the Board of Directors on January 16, 2002 by then Chief Financial Officer Thomas Mutryn. In his presentation Mr. Mutryn's "base case" scenario predicted that Group's cash balance would never drop below $666 million, and that the balance at the end of the year would be $809 million. Even his conservative estimate left Group with a cash balance of $540 million at the close of the 2002 fiscal year. This compares with a $200 to $250 million "threshold level" Mr. Mutryn deemed necessary for the airline to operate.

---

the review by legal counsel, the legal issues raised in the Enron case do not apply to the common stock fund offered as an investment option in the defined contribution plans.

**9.** The December 31, 2001 Quarterly Performance Report indicated that only 5.6% of the Company's defined contribution plans' assets were invested in the Company Stock Fund as of December 31, 2001. Likewise, the Company Stock Fund represented 2.2% of total pension assets as of December 31, 2001.

94. Mr. Mutryn's liquidity plan included preparing but not filing a federal loan application, and vigorously attempting to improve revenues while reducing costs. His presentation to the Board of Directors did not mention the possibility of bankruptcy, and Mr. Mutryn testified credibly that he did not believe it was a realistic possibility at that point.

95. At this point in time, Wall Street analysts were taking a "wait-and-see" approach with respect to U.S. Airways and its financial prospects. As of January 30, 2002, according to the IBES Compilation of Analyst Ratings, all nine investment analysts covering the stock gave a "Hold" recommendation, an essentially neutral rating that is not indicative of imminent bankruptcy.

96. On March 6, 2002, U.S. Airways hired David Siegel as its President and Chief Executive Officer. Mr. Siegel, in turn, hired Neal Cohen to replace Thomas Mutryn as Chief Financial Officer. Upon taking the reins, Mr. Siegel retained Seabury Airline Aviation Consultants ("Seabury") to assist U.S. Airways with its restructuring. Seabury had successfully assisted America West Airlines in its financial restructuring and attainment of loan financing from the Air Transportation Stabilization Board ("ATSB").[10]

97. As predicted, U.S. Airways' losses continued during the first quarter of 2002. For the three month period ending March 31, 2002, Group recorded a net loss of $269 million.

98. Following U.S. Airways' announcement of its results on April 18, 2002, CEO David Siegel spoke to industry analysts on a conference call. He announced the initiation of a new restructuring plan which would require the participation of all U.S. Airways' stakeholders. He also stated that the Company would likely apply to the ATSB for a grant to provide liquidity while the Company executed its restructuring plan. Mr. Siegel publicly affirmed Mr. Mutryn's January 2002 prediction that cash flow would turn positive in the second quarter of 2002, but he admitted the Company would face pressure on its cash position in the third and fourth quarters of 2002 if the restructuring plan were not instituted.

99. The market took the announcement of U.S. Airways' results, and Mr. Siegel's description of U.S. Airways' restructuring plan, in stride. The price of a unit of the Company Stock Fund dropped slightly from an April 18, 2002 price of $10.46 to an April 19, 2002 price of $10.24.

100. On May 10, 2002, U.S. Airways filed its Form 10–Q for the three month period ending March 31, 2002. In its filing, U.S. Airways elaborated on its proposed restructuring plan by describing its three key elements: (1) a lower cost structure in which the participation of all key stakeholders including employees, suppliers and financial providers would be essential; (2) a plan for deploying a significant increase in regional jets in the U.S. Airways Express system; and (3) a means to access the significant amount of incremental revenue U.S. Airways could achieve by becoming part of a larger domestic and international network.

101. The Form 10–Q also provided:

---

**10.** The ATSB was created by Congress as part of the Air Transportation Safety and System Stabilization Act to determine whether to grant air carriers' request for a federal loan guarantee. *See* 49 U.S.C. § 40101.

The Company contemplates that such a restructuring plan would be supported by liquidity assistance in the form of a government-guaranteed loan under the Air Transportation Safety and Stabilization Act (Stabilization Act) referred to below. The Company's preferred approach, which it is actively pursuing, is to reach an accord with its key stakeholders and obtain assistance under the Stabilization Act on a timely basis in light of its significant liquidity issues. However, because there is no assurance that this will occur, the Company also recognizes that in order to successfully restructure the Company, alternative restructuring scenarios in the context of a judicial reorganization also must be considered. The Company is addressing these scenarios on a contingency basis.

102. The proposed ATSB loan was to be comprised of $900 million of federally guaranteed loans and $100 million from unsecured lenders intended to demonstrate the confidence of the investment community. US Airways lined up Bank of America and Airbus as its unsecured creditors. The ATSB loan process also required U.S. Airways to demonstrate that it had a viable business plan and could demonstrate reasonable assurance that it could repay the loan.

103. Under the heading "Liquidity and Capital Resources," the Form 10–Q disclosed that the Company's balance of cash, cash equivalents and short-term investments had been reduced by roughly 50% over the first quarter from over $1 billion to $561 million. This dramatic decrease in U.S. Airways' cash position was primarily attributable to a loss of $438 million in U.S. Airways operations, and also included the payment of $188 million in ticket taxes which had been deferred from 2001 by the Stabilization Act. In addition, U.S. Airways acknowledged that:

The Company continues to be highly leveraged. It has a higher amount of debt compared to equity capital than most of its principal competitors. Substantially all of its aircraft and engines are subject to liens securing indebtedness. The Company and its subsidiaries require substantial working capital in order to meet scheduled debt and lease payments and to finance day-to-day operations. The Company has not generated positive operating cash flow since September 11, 2001. There can be no assurances that the Company can achieve or sustain positive cash flow from operations. In addition, the Company expects there to be pressure on its cash position later in the year, without taking into account the restructuring plan . . . .

104. This announcement triggered a drop in the price of Group's publicly traded shares and a corresponding drop in the unit price of the Company Stock Fund, which fell from a closing price of $8.92 per unit on May 9, 2002 to a closing price of $6.73 on May 10, 2002 and fell further to a closing price of $5.72 per unit on May 13, 2002.

105. While acknowledging that the Company would be developing contingency plans for a judicial restructuring, U.S. Airways' efforts focused chiefly on implementing its strategic plan through a voluntary, out-of-court restructuring. The most formidable challenge to U.S. Airways' successful restructuring, and the key to a successful loan application with the ATSB, was U.S. Airways' ability to obtain wage concessions from certain unions. Management's view at the time, as stated succinctly by Mr. Wolf

in his testimony, "was always that rational thinking would prevail, rather than having the airline go under." In other words, management reasonably believed, though erroneously as it turned out, that U.S. Airways employees would choose the certainty of reduced pay and benefits over the uncertainty of a possible bankruptcy filing or, indeed, the possible disappearance of the airline. This view, based as it is on the presumption that people typically behave rationally, was a reasonable one, and therefore, management's testimony at trial that they believed bankruptcy would be avoided is credible.

5. *The Decision to Hire an Independent Fiduciary*

106. In May 2002, at the same time PIC members were involved in meetings to discuss the Company's plans to restructure, the PIC began discussing the appointment of an independent fiduciary with its outside legal counsel, Gary Ford, a prominent benefits attorney with the Groom Law Group in Washington, D.C.

107. Then, on May 9, 2002, at a special meeting of the Board of Directors during which management discussed the Company's intention to announce the possibility of a judicial restructuring, the Board also considered, *inter alia*, the appointment of an independent fiduciary for certain employee benefit plans. As reflected in the meeting minutes, Ms. Bryan reported to the Board that certain defined contribution plans [11] of the Company provided Group stock as an investment option and recommended the appointment of an independent fiduciary to assume U.S. Airways' fiduciary responsibilities with respect to the Company Stock Fund in light of the Company's financial performance and potential liquidity situation.

108. The Board of Directors accepted this recommendation and, during this same meeting, voted to retain an independent fiduciary for the Company Stock Fund, and authorized Mr. Cohen to take prompt steps to retain the independent fiduciary. That same day, the Groom Law Group, on behalf of U.S. Airways, began soliciting proposals from third parties to serve as an independent fiduciary for the Company Stock Fund.

109. On Friday, May 31, 2002, the Groom Law Group provided the PIC with a memorandum summarizing the proposals it had received from a number of independent fiduciaries and addressing the various legal issues associated with the appointment of an independent fiduciary for the Company Stock Fund. On Monday, June 3, 2002, the first business day after receiving the memorandum, the PIC formally met to discuss the proposals and actions that needed to be taken in connection with retaining an independent fiduciary for the Company Stock Fund.

110. Initially, U.S. Airways selected a company to serve as the independent fiduciary, but that company was ultimately unable to accept the appointment. The Company thereafter decided to retain Fiduciary Counselors. Pursuant to this decision, U.S. Airways and Fiduciary Counselors en-

---

11. The Plan was one of several defined contribution plans provided by U.S. Airways to its employees that offered the Company Stock Fund as an investment option. *See DiFelice II*, 397 F.Supp.2d at 766 n. 5. (describing the other participant directed plans that offered the Company Stock Fund as an investment option).

tered into an agreement on June 18, 2002 appointing Fiduciary Counselors as the named fiduciary for the Company Stock Fund.

111. Fiduciary Counselor's appointment was to become effective immediately upon execution of the requisite Plan amendments and notification to participants advising them of their appointment. In this regard, U.S. Airways amended the Plan to appoint an independent fiduciary for the Company Stock Fund, with full authority and discretion to continue to offer the Company Stock Fund as an investment option under the Plan on such terms and conditions as the independent fiduciary determined to be prudent and in the interests of Plan participants. The Plan amendment also delegated to the independent fiduciary full authority to terminate the Company Stock Fund and to undertake an orderly sale of assets.

112. It is significant to note, as the record reflects, that at the time U.S. Airways retained Fiduciary Counselors to manage the Company Stock Fund it was unusual for an independent fiduciary to be appointed in a participant-directed plan, as the appointment of independent fiduciaries generally occurred in the context of employee stock ownership plans ("ESOP"), consisting primarily of employer stock. According to Ms. Hennessy, the President and CEO of Fiduciary Counselors, the appointment of Fiduciary Counselors as independent fiduciary with respect to the Company Stock Fund was one of the first situations, if not the first, in which the internal fiduciaries appointed an independent fiduciary in connection with a plan's company stock fund in a non-ESOP setting.

113. On June 27, 2002, U.S. Airways sent a letter to all Plan participants advising them of Fiduciary Counselors' appointment as independent fiduciary for management of the Company Stock Fund. In this letter, the Company explained that as the independent fiduciary, "Aon Fiduciary Counselors has the authority to continue, restrict, or terminate the investment of plan assets in U.S. Airways common stock." The June 27, 2002 letter also reminded participants that:

Defined contribution plan participants continue to have responsibility for directing how their contributions are invested. Unless the independent fiduciary decides to change or remove the U.S. Airways Common Stock Fund as an investment option, participants are solely responsible for deciding whether to exchange in or out of the U.S. Airways Common Stock Fund and whether to direct future contributions to the Fund. U.S. Airways will continue to act as fiduciary of the Company's retirement plans for all other purposes, including the selection of the other investment options to be offered under the plans.

114. The June 27, 2002 letter further explained that the Company had retained an independent fiduciary because President and CEO, David Siegel, had said on several occasions that the company must restructure either voluntarily or through a Chapter 11 judicial restructuring and that either course of action would clearly have an impact upon the value of Group's common stock. The letter further explained that the appointment of an independent fiduciary would ensure that decisions regarding the Group stock held by the Plan were made solely in the interest of Plan participants and beneficiaries and would avoid any real or perceived conflict of

interest in connection with those decisions.

115. While the search for an independent fiduciary was pending, between May 10, 2002 and June 27, 2002, the PIC continued to consider the prudence of maintaining the Company Stock Fund as an investment option. Throughout this period, members of the PIC continued to believe that the Company's plan to achieve a voluntary restructuring would succeed and that the Company would be able to avoid bankruptcy. And the record reflects that this belief was well-founded. Although, at all times during the class period bankruptcy was a risk, the Company had a credible and viable voluntary restructuring plan with a reasonable chance of success, and therefore bankruptcy, during the class period, was never imminent in the sense that it was certain to occur in the immediate future.

116. Further, at no time did U.S. Airways or members of its management team present to Plan participants, or to the investment community any false or misleading information about the business and financial prospects of U.S. Airways. To the contrary, throughout the class period, members of U.S. Airways' management team were forthright and forthcoming concerning the challenges the Company was facing, the prospects for a successful non-judicial restructuring, and the risk of bankruptcy.

**D. Post Class Period Events**

*1. Failure of the Voluntary Restructuring Plan and the Bankruptcy Filing*

117. On June 24, 2002, just three days prior to Fiduciary Counselors' assumption of control over the management of the Company Stock Fund, and the end of the class period, U.S. Airways announced that it would "defer selected payments owed principally to aircraft lessors and lenders targeted by the Company to participate in the restructuring plan." US Airways acknowledged that "[t]hese defaults, which could eventually lead to cross defaults with other lessors, vendors and creditors if not rescinded and, potentially, acceleration of those obligations could force the Company into a filing for reorganization under Chapter 11 of the Bankruptcy Code."

118. Thereafter, on July 1, 2002, U.S. Airways announced that it would not make "scheduled payments on certain public debt obligations also related to grounded aircraft and selected older Boeing aircraft still in service."

119. But not all the news was bad. On July 10, 2002, the ATSB unanimously approved U.S. Airways' application for a $900 million loan guarantee subject to U.S. Airways' ability to obtain the necessary concessions from its employees and creditors. The ATSB regulations provided that a loan guarantee could issue only if the ATSB found that the government's obligation "is prudently incurred" (i.e., the applicant would be likely to repay its obligations). *See* 14 C.F.R. § 1300.10(a)(2); *see also* 14 C.F.R. § 1300.17 (setting forth the criteria for the ATSB's consideration of a loan guarantee application, including the requirement that there be "reasonable assurance that the borrower will be able to repay the loan by the date specified.").

120. In this respect, as of July 17, 2002, U.S. Airways had obtained concessions from every major labor union except the International Association of Machinists and Aerospace Workers ("IAM") and the Communications Workers of America ("CWA").

121. Despite these efforts, it became clear by early August 2002 that management would be unable to obtain concessions from the two remaining recalcitrant unions and that bankruptcy was the only available option. Accordingly, on August 11, 2002, Group and seven of its subsidiaries, including U.S. Airways, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. *See In re U.S. Airways Group, Inc. et al.*, Case No. 02–83984–SSM, 2002 WL 32783902.

### 2. *Fiduciary Counselors' Actions as Independent Fiduciary*

122. Effective June 27, 2002, the date of its appointment, Fiduciary Counselors directed Fidelity to increase the cash liquidity component of the Company Stock Fund from 10% to 20%, which would effectively cause the sale of some of Group's shares held by the Company Stock Fund.

123. Fiduciary Counselors did not direct Fidelity to sell shares of Group stock beyond that necessary to achieve the 20% cash component because, as Fiduciary Counselors' President and CEO, Nell Hennessy, testified, Fiduciary Counselors did not believe that either Group or its subsidiaries would file for bankruptcy. Indeed, not until the August 11 bankruptcy filing actually occurred did Fiduciary Counselors believe that U.S. Airways would resort to a judicial restructuring.

124. On July 3, 2002, Fiduciary Counselors instructed Fidelity not to purchase additional shares of Group stock for the Company Stock Fund, although it did not halt new investments by participants in the Fund at that time. Indeed, at no time prior to the August 11, 2002 bankruptcy filing did Fiduciary Counselors, in its role as independent fiduciary, close the Company Stock Fund to participants seeking to make new investments nor did it ever prevent participants from selling their existing units of the Company Stock Fund.

125. On July 26, 2002, Fiduciary Counselors sent a letter to Plan participants informing participants of the steps it had taken to date with respect to the Company Stock Fund. In this letter, Fiduciary Counselors advised participants as follows:

Currently, the Common Stock Fund remains open. None of our actions to date change any of your existing rights to transfer amounts into the Stock Fund, to transfer amounts out of the Stock Fund to other investment funds available under the Savings Plans or to withdraw amounts from the Stock Fund.

While U.S. Airways is engaged in its restructuring efforts however, we have determined that it is not prudent at this time to purchase additional Common Stock for the Stock Fund. We have therefore directed Fidelity Management Trust Company, the Trustee of the Savings Plans, not to make any additional purchases of Common Stock on behalf of the Plans and to gradually increase the percentage of cash investments in the Stock Fund. Thus, if you direct any new contributions to invested in the Stock Fund or transfer any existing account balances in other investment funds to

the Stock Fund, your contributions and transferred amounts will not be used to purchase additional shares of Common Stock but will increase the Stock Fund's cash investment. Currently, approximately 20 percent of the Stock Fund is held in cash investments.

### 3. The Bankruptcy Filing and its Effects on the Company Stock Fund

126. Not until August 12, 2002, the day after U.S. Airways filed for bankruptcy, did Fiduciary Counselors direct Fidelity to close the Stock Fund.

127. In the period of time after Fiduciary Counselors' appointment and prior to U.S. Airways' filing for bankruptcy, Fidelity had sold 2,027,500 shares of Group stock. Of this number, 1,615,051 were sold pursuant to participant's directions, and the remaining 412,449 were sold pursuant to Fiduciary Counselor's authority as independent fiduciary.

128. On August 13, 2002, Fiduciary Counselors sent a letter to Plan participants advising the participants that U.S. Airways had filed for bankruptcy protection on August 11, 2002. The letter warned participants that in connection with the bankruptcy filing, "US Airways announced that one of the elements of any plan or reorganization may be the cancellation of the Company's existing equity securities without the prospect of any distributions to existing holders. As a result, we have halted all activity within the U.S. Airways Stock Fund." The letter further advised participants that the cash component of the Company Stock Fund would be transferred to the Money Market Portfolio, which is the default investment option in the Plan, and by the next day (August 14, 2002) participants would be able to move that cash from the Money Market Portfolio into any of the remaining investment options in the Plan.

129. On September 6, 2002, Fiduciary Counselors instructed Fidelity to sell 889,800 shares of Group stock held by the Company Stock Fund.

130. On September 9, 2002, Fiduciary Counselors advised Plan participants that as of Monday, September 16, 2002, they could sell the Group stock in their Plan account. The letter further advised participants that "[i]n making your decision, you should be aware that U.S. Airways has stated that the existing stock may be cancelled as a condition of a future plan of reorganization, without the prospect of any distributions to existing shareholders. Creditors or new investors are likely to be issued new stock as part of any plan of reorganization. As a result, it is likely that the existing stock will be worth little if anything, even if it is not cancelled."

131. On December 20, 2002, Fiduciary Counselors directed Fidelity to sell 680,900 shares of Group stock held in the Company Stock Fund.

132. On December 30, 2002, Fiduciary Counselors again advised participants that under the proposed plan of reorganization, the existing Group stock would be cancelled and stockholders would receive no distribution under the plan.

## II. CONCLUSIONS OF LAW

The essential question for decision is whether U.S. Airways violated its duty as

the Plan fiduciary when, during the class period, it retained the Company Stock Fund as an investment option for Plan participants despite the Company's precarious financial position.

## A.

It is undisputed that U.S. Airways was a fiduciary under the Plan,[12] and was therefore obligated, as ERISA commands, to exercise its fiduciary duties—

> with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). But the recognition that U.S. Airway's conduct as an ERISA fiduciary is judged by a "prudent man" standard is only the beginning of the analysis; the important remaining task is to elucidate this ERISA "prudent man" standard to discern its meaning and applicability to the facts of this case. The first step in this analysis is to define the scope of U.S. Airways' authority under the Plan, for it is settled law that fiduciary duties are defined in func-

tional terms, such that a person or entity is considered a fiduciary only "to the extent he exercises any discretionary authority or discretionary control respecting management of [the] plan or exercises any authority or control respecting management or disposition of its assets...." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). In the Fourth Circuit's words, "a party is a fiduciary only as to the activities which bring the person within the definition .... In other words, a court must ask whether a person is a fiduciary with respect to the particular activity at issue." *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir.1992). Accordingly, before assessing whether U.S. Airways breached its "prudent man" fiduciary duty in this case, it is necessary to have a clear picture of the nature of the Plan and the allocation of authority between the various actors.

The Plan is a "defined contribution plan" as defined by ERISA; it provides for "an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participants' accounts."[13] Further-

---

**12.** *See DiFelice v. U.S. Airways, Inc.*, 397 F.Supp.2d 758, 767 (E.D.Va.2005).

**13.** *See* ERISA § 3(34), 29 U.S.C. § 1002(34). "Defined contribution plans" must be distinguished from "defined benefit plans," the latter typically promising participants that, upon retirement, they will receive a set benefit in the form of a fixed percentage of their pre-retirement salary. *See* 29 U.S.C. § 1002(35). Defined contribution plans, by contrast, do not promise a specific benefit to participants, but instead provide participants with the opportunity to invest a portion of their salary in one or more investment options and thereby reap whatever returns may result from their investment decisions. For this reason, courts typically point out that participants in defined

contribution plans bear the investment risk of losing funds they invest in the plan. *See Bash v. Firstmark Standard Life Ins. Co.*, 861 F.2d 159, 163 (7th Cir.1988) (to impose liability upon plan fiduciaries for account losses in a defined contribution/individual account plan would give participants "the best of both worlds" resulting in "an inequity of the heads I win, tails you lose variety that neither the ERISA statute nor the ... plan documents perpetrate."); *Eaton v. Onan Corp.*, 117 F.Supp.2d 812, 817 (S.D.Ind.2000) ("Because a participant's retirement benefit is not a fixed amount, the participant bears the investment risk."); *see also In re Unisys Savings Plan Litig.*, No. 91–3067, 1997 WL 732473, at *25 n. 30 (E.D.Pa. Nov. 24, 1997) (noting that participants in a defined contribution plan,

more, because participants are entitled to certain tax benefits for their contributions, the Plan also qualifies as what is commonly referred to as a "401(k) plan." *See* 26 U.S.C. § 401(k). The Plan's scheme (although not mandated by ERISA), is one commonly found and used in retirement plans. In essence, the Plan allocates responsibility and authority among three principle actors: (1) the Plan fiduciary, (2) the Plan participants, and (3) the directed trustee. Fidelity, the Plan's directed trustee, had the least authority, playing only an essentially ministerial role in Plan administration. Because Fidelity had no authority to select or de-select investment options or to direct investment choices, it could not be liable for any losses to the Plan attributable to the selection of investment choices. *See DiFelice I,* 397 F.Supp.2d at 755.

Plan participants had considerably greater authority; they were responsible for making their own specific investment choices and for allocating their Plan contributions (including U.S. Airways' matching contributions) among the various investment options offered under the Plan. It is worth emphasizing that Plan participants had virtually complete freedom to direct both their 401(k) contributions and the Company's matching contributions among the available investment options,[14] and to transfer their Plan account assets among the available investment options on a daily basis.[15]

Finally, U.S. Airways, as Plan fiduciary, had the authority and the discretion to select the investment options among which Plan participants could choose to invest their Plan contributions.[16] Importantly, U.S. Airways also had the duty to monitor the performance of the investment options provided to the Plan participants and U.S. Airways had both the discretion and authority to remove an investment option. In sum, then, the Plan's division of authority, distilled to its essence, is that U.S. Airways was responsible for the discretionary selection and monitoring of Plan investment options, whereas Plan participants were responsible for their own individual investment choices and for allocating their account assets among the various

not the employer, assume the risk of loss for their investments).

**14.** The thirty day restriction on reinvesting assets transferred out of the Company Stock Fund back into the Company Stock Fund is the one notable exception to participants' complete authority over the distribution of their account assets among Plan investment options.

**15.** The Plan was designed to comply with ERISA § 404(c), 29 U.S.C. § 1104(c), which shields fiduciaries for liability resulting from participant directions in certain circumstances. Significantly, plaintiff does not allege that U.S. Airways should be responsible for the decisions of the Plan participants when they chose how to allocate their funds among the various investment options. For this reason it is unnecessary to determine whether resort to § 404(c)'s safe harbor is necessary to protect U.S. Airways from liability for any of the participants' imprudent investment decisions. *Compare In re Enron*

*Corp. Securities, Derivative, & ERISA Litig.,* 284 F.Supp.2d 511, 578 (S.D.Tex.2003) ("If a plan does not qualify as a § 404(c), the fiduciaries retain liability for all investment decisions made, including decisions by the Plan participants.") *with Jenkins v. Yager,* 444 F.3d 916, 924 (7th Cir.2006) ("[ERISA] permits a plan trustee to delegate decisions regarding the investment of funds to plan participants even if the plan does not meet the requirements for the 404(c) safe harbor.").

**16.** Because U.S. Airways' selection of investment alternatives was not the result of a participant direction, U.S. Airways' attempt to take advantage of the safe harbor provision of § 404(c) has already been denied. *See DiFelice II,* 397 F.Supp.2d at 777 ("[A] breach of a fiduciary's duty to exercise prudence in selecting Plan investment options is not the type of breach for which § 404(c) provides a defense.").

investment options offered in the Plan. Because the alleged breach of fiduciary duty concerns only U.S. Airways' exercise of its authority under the Plan, the proper focus here is on whether U.S. Airways' exercise of that authority in the circumstances of this case violated the "prudent man" ERISA fiduciary standard. More precisely, the question is whether ERISA's "prudent man" standard required U.S. Airways to eliminate the Company Stock Fund as an investment option in view of the Company's precarious financial condition during the class period.

## B.

■ The parties do not dispute the general principles underlying the "prudent man" standard in the abstract. Thus, both parties accept that the prudent man standard is derived from the law of trusts,[17] and that, in the context of a plan fiduciary's investment choices, "the appropriate benchmark with which to judge a fiduciary's behavior is an objective one 'measured against the standard of the investment industry.'" *DiFelice v. Fiduciary Counselors, Inc.*, 398 F.Supp.2d 453, 467 (E.D.Va. 2005) (quoting *Ulico Casualty Co. v. Clover Capital Mgmt., Inc.*, 335 F.Supp.2d 335, 340 (N.D.N.Y.2004)). Where the parties views diverge is with respect to the application of the standard to the facts of this case.

■ The plaintiff's theory of liability is premised on the riskiness of an individual investment in the Company Stock Fund. Specifically, plaintiff contends that the ERISA "prudent man" standard required U.S. Airways to preclude participants from investing in the Company Stock Fund during the class period because of the imminence or high probability of Group's bankruptcy.[18] In support of this proposition, plaintiff offered the testimony of Dr. Edward Altman, who described his mathematical model designed to measure the likelihood or probability of bankruptcy for any company. In essence, the model is a multi-factor algorithm which he claimed would reliably predict bankruptcy for a company when pertinent historical financial data was plugged into the equation.[19] Plaintiff contends U.S. Airways, or more specifically its delegates on the PIC, should have used this and other tools to measure the likelihood of bankruptcy for the Company and that because the likelihood was high during the class period, U.S. Airways, as a prudent man fiduciary, should have pulled the Company Stock Fund as a Plan investment option for participants.

Neither the factual record nor ERISA support plaintiff's contention. First, as a factual matter, the trial testimony confirmed that the Altman Z–Score models do not take into account factors affecting the probability of bankruptcy that are not reflected in a company's financial statements, and for this reason, the Altman

17. *See Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir.2001) ("Congress intended ERISA's fiduciary responsibility provisions to codify the common law of trusts.").

18. While it is well-established that "the general fiduciary obligation of § 404(a) does not require prescience of fiduciaries, but instead measures a fiduciary's performance based on the facts then at their disposal," plaintiff's argument is that the likelihood of bankruptcy was so great that any prudent investor would

have determined that bankruptcy was very likely to occur. *See DiFelice v. Fiduciary Counselors, Inc.*, 398 F.Supp.2d 453, 467 (E.D.Va.2005) (citing *Roth v. Sawyer–Cleator Lumber Co.*, 16 F.3d 915, 917–18 (8th Cir. 1994) ("[T]he prudent person standard is not concerned with results; rather it is a test of how the fiduciary acted viewed from the perspective of the 'time of the challenged decision' rather than from the 'vantage point of hindsight.'")).

19. *See supra* ¶ 66.

models are not generally relied upon by fiduciaries determining the bankruptcy risk of an investment in an individual security.[20] But plaintiff's theory of liability fails for the more fundamental reason that plaintiff views the prudence of an investment in the Company Stock Fund as an isolated investment instead of as a part of a portfolio of investments. As noted, ERISA's "prudent man" standard requires fiduciaries to act with the same skill as a prudent man undertaking the same tasks in the same circumstances. *See* 29 U.S.C. § 1104(a). In the present context, this means that U.S. Airways was required to act pursuant to the standards of the investment industry, and the uncontroverted trial testimony is that the investment community does not judge an investment by its individual risk and return characteristics, but by its contribution to the risk and return characteristics of a portfolio of investments. This standard is based on the portfolio management theory, which teaches that because the risks of different investments are not perfectly correlated, the risks of a portfolio seeking a given return can be minimized by diversifying the investments within a portfolio. Thus, the overall risk to a portfolio is not always reduced by choosing a less risky investment over a more risky investment. Indeed, "[m]odern portfolio theory suggests that overall risk can actually be *reduced* by adding more risk." *See* Charles J. Goetz, *Cases and Materials on Law and Economics* 128–29 (1984).

Nor is the authority and relevance of the portfolio management theory confined to the investment community and academia; it is also specifically endorsed for ERISA purposes by the Department of Labor, which in its regulations confirms that fiduciaries with responsibility for selecting investments should consider "the role the investment ... plays in that portion of the plan's investment portfolio" and "[t]he composition of the portfolio with regard to diversification." 29 C.F.R. § 2550.404a–1.[21] Caselaw, sparse as it is, is to the same effect. Thus, the Fifth Circuit has adopted the modern portfolio theory in the context of an ERISA breach of fiduciary duty case wherein an investment manager was alleged to have breached its duty by investing plan assets in relatively risky interest-only mortgage backed securities. *See Laborers National Pension Fund v. Northern Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 315 (5th Cir.1999). In finding for the plaintiff, the district court had stated: "It does not matter that the other investment consultants in the industry held the opinion that [these derivative investments] were appropriate for modern investment portfolios or that the portfolio as a whole made an adequate return." *Id.* at 322. The Fifth Circuit rejected this proposition, stating that—

> the district court erroneously judged the [derivative] investment in isolation under the common law standard, instead of according to the modern portfolio theory required by ERISA policy as expressed by the Secretary's regulations.... Since 1979, investment managers have been held to the standard of prudence of the

---

20. *See supra* ¶ 67.

21. Similarly, the preamble to the Department of Labor's regulations also highlight the importance of the modern portfolio theory to determinations of prudence in selecting investment options:

> [T]he prudence of an investment decision should not be judged without regard to the

role that the proposed investment or investment course of action plays within the overall plan portfolio. Thus, although securities issued by a small or new company may be a riskier investment than securities issued by a 'blue chip' company, the investment in the former company may be entirely proper under the Act's prudence rule.

44 Fed.Reg. 37222.

modern portfolio theory by the Secretary's regulations.

*Id.* Considering the derivative investments in light of the "prudent investor, modern portfolio principles of ERISA and the Department of Labor regulations" the Fifth Circuit concluded that the derivative securities were a prudent investment, and reversed the district court. *Id.* at 323. *See also In re Cardinal Health, Inc. ERISA Litig.*, 424 F.Supp.2d 1002, 1020 (S.D.Ohio 2006) ("[A] fiduciary with investment duties must act as a prudent investment manager under the modern portfolio theory rather than under the common law of trusts standard, which examined each investment with an eye toward its individual riskiness."). Thus, ERISA requires that the prudence of selecting a particular investment be viewed in light of its contribution to the risk and return of the entire portfolio, and not in light of its individual risk.

The fact that the Company Stock Fund, viewed individually, was a risky investment does not, therefore, resolve the issue of U.S. Airways' liability as an ERISA fiduciary. Because the risks facing U.S. Airways were publicly disclosed,[22] the unit price of the Company Stock Fund reflected the risk that Group's bankruptcy filing would diminish or eliminate the value of the shares at all times during the class period. And, because investors who assume greater risk are compensated for that risk with the possibility of greater returns, the price of Group's shares (and by extension units of the Company Stock Fund) offered participants a potential return far in excess of the other Plan investment options.[23] As the portfolio management theory instructs, and as plaintiff's expert Dr. Altman conceded, high-risk, high-yield securities are an appropriate investment as part of a diversified portfolio.

Given this, the question then becomes whether, in its role as Plan fiduciary, U.S. Airways provided Plan participants with the investment options and the information necessary to allow the participants to construct a diversified portfolio. If these requirements are met, and the record clearly so reflects, U.S. Airways has satisfied its fiduciary duty to act prudently under ERISA when selecting and monitoring the Plan's investment options. In this regard, it is not disputed that at all times during the class period, U.S. Airways continued to offer Plan participants thirteen different investment options that spanned the range of risk and return characteristics. At one end of this range was the relatively low risk and low expected return money market fund. At the opposite end of this range was the relatively high risk, high expected return Company Stock Fund. In between these two poles were investment options that offered Plan participants investment choices with intermediate risk/return characteristics. The literature provided by U.S. Airways to Plan participants repeatedly advised them that by diversifying their account assets among investments with different risk/return characteristics, Plan participants could minimize the risk of their portfolio for a given expected return. US Airways also specifically cautioned participants about the risks involved in investing in the Company Stock Fund, and advised participants

---

**22.** For this reason, this case can be easily distinguished from those cases in which employees were offered as an investment option company stock whose price was artificially inflated by management's material misrepresentations. *See, e.g., In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 284 F.Supp.2d 511, 555–63 (S.D.Tex.2003); *In re*

*Polaroid ERISA Litig.*, 362 F.Supp.2d 461, 478 (S.D.N.Y.2005).

**23.** For this reason, it can therefore be expected that had U.S. Airways successfully completed its plan to achieve a voluntary restructuring outside of bankruptcy, Group's share price would have increased greatly.

throughout the class period of the Company's distressed financial outlook. Thus, because the investment options offered by the Plan allowed participants to construct a prudent, diversified portfolio, and because participants had the information necessary to construct a prudent portfolio of investments, the inclusion of a high risk investment option during the class period, in this case the Company Stock Fund, was not a breach of U.S. Airways' fiduciary duty.

This conclusion is buttressed by ERISA's recognition of the unique status of company stock in an employee pension plan. In this regard, it is not disputed that the Plan was an "eligible individual account plan" ("EIAP") as defined by ERISA,[24] nor that Congress has exempted EIAPs from certain otherwise applicable limitations on fiduciary actions with respect to company stock. First, an EIAP is permitted to hold more than 10% of its assets in employer securities,[25] and second, with respect to investments in company stock, fiduciaries are not bound by ERISA § 404(a)(1)'s otherwise applicable duty to diversify or the prudence requirement to

the extent that it requires diversification. *See* 29. U.S.C. § 1104(a)(2) (providing that those requirements are "not violated by acquisition or holding of qualifying employer real property or qualifying employer securities."). *See also Smith v. Delta Air Lines, Inc.,* 422 F.Supp.2d 1310, 1325 (N.D.Ga.2006) ("EIAP fiduciaries do not have a duty to diversify and do not act imprudently by not diversifying the assets of an EIAP."). As has been recognized by the courts, "Congress enacted this exemption because it believed that, in permitting unlimited investment in employer securities, such plans are a 'device for expanding the national capital base among employees—an effective merger of the role of capitalist and worker.'" *In re Williams Cos. ERISA Litig.,* 271 F.Supp.2d 1328, 1331–32 (N.D.Okla.2003) (applying ERISA's section 404(a)(2) exemption to a 401(k) plan) (quoting *Donovan v. Cunningham,* 716 F.2d 1455, 1458 (5th Cir.1983)).[26] Thus, as currently enacted, ERISA is especially solicitous of decisions to hold employer securities, or indeed, to permit participants to choose to invest in employer securities.[27] Thus, if, as in this case, a

---

**24.** EIAPs are defined by ERISA § 407(e)(3)(A) in pertinent part as an "individual account plan which is (i) a profit-sharing, stock bonus, thrift, or savings plan...." 29 U.S.C. § 1107(e)(3)(A).

**25.** *See* ERISA § 407(b)(1), 29 U.S.C. § 1107(b)(1).

**26.** This proposition finds further support in recently introduced amendments to ERISA which, if enacted, would limit the amount of employer stock a 401(k) plan participant could hold in his or her account. A summary of these proposals is included in a report prepared by the Staff of the Joint Committee on Taxation titled Background Information Relating to the Investment of Retirement Plan Assets in Employer Stock and is available at *http://www.house.gov/jct/x–1–02.pdf*. The obvious implication of these bills is that ERISA, as currently codified, contains no such limitation.

**27.** This solicitude in the context of a 401(k) plan should not be confused with the "presumption of prudence" accorded to the holding of company stock in an employee stock ownership plan ("ESOP") recognized by the Third and Sixth Circuits. *See Moench v. Robertson,* 62 F.3d 553, 568 (3rd Cir.1995); *Kuper v. Iovenko,* 66 F.3d 1447, 1457 (6th Cir. 1995). Unlike the 401(k) plan at issue in this case, ESOPs are designed to consist primarily of company stock, and thus the prudence standard that applies to the decision to retain company stock in an ESOP is of a different nature than the decision to continue to offer company stock as an investment option in a 401(k) plan. Unlike ESOPs, the prudence of continuing to offer company stock as an investment option in a 401(k) plan will depend largely on the other investment options offered to participants, and the participants' ability to diversify their account assets among those investment options.

401(k) plan offers participants a broad array of investment choices, one of which is a relatively risky option to invest in employer securities, the fiduciary should not be deemed to have violated any fiduciary duty for offering this option provided the investment in company stock remains viable, and the company has fully disclosed to participants the risks attendant in that investment.

In the instant case, there is no question the Company Stock Fund was a viable investment option throughout the class period. While U.S. Airways faced significant and well-publicized risks, the opportunity for significant gain in the event the Company were to succeed in its voluntary restructuring efforts made the Company Stock Fund a legitimate option for Plan participants who included it as part of a well-diversified portfolio. The uncontested testimony of the members of the PIC was that the Company Stock Fund was regarded as such throughout the class period, and that the PIC members continued to believe that the Company's efforts to restructure outside of bankruptcy proceedings would prove successful. And, the ATSB's contingent approval of the Company's loan application confirms that U.S. Airways would have been a viable ongoing entity had it been able to obtain the remaining necessary labor concessions. Furthermore, as soon as U.S. Airways publicly announced the possibility of a bankruptcy filing it took appropriate action by hiring an independent fiduciary to make decisions regarding the Company Stock Fund. In sum, the fact that U.S. Airways was not able to avoid a bankruptcy filing, thereby greatly diminishing the value of units of the Company Stock Fund is not evidence of U.S. Airways' breach of its fiduciary duties, but simply evidence of why investors are compensated for risk.

In addition to plaintiff's focus on the individual riskiness of the Company Stock Fund, the plaintiff also premises his theory of liability on U.S. Airways' alleged failure to employ the proper methods in monitoring the performance of the Company Stock Fund and consequent failure to adequately consider its retention. *See* 29 C.F.R. § 2550.404a–1. This contention is simply not supported by the facts adduced at trial. The PIC formally considered the prudence of retaining the Company Stock Fund at its December 2001 meeting, and during the January and May board meetings. In addition, through their role on U.S. Airways' management team, the PIC members well aware of U.S. Airways' financial condition and prospects, and therefore also well-aware of the risk/return characteristics of an investment in the Company Stock Fund. *See Donovan v. Cunningham,* 716 F.2d 1455, 1469 (5th Cir.1983) (ERISA fiduciaries are "entitled to consider the information available to them by virtue of their management positions."); *Smith v. Sydnor,* Case No. 98cv241, 2000 WL 33687953, at *16 (E.D.Va.2000) (same). Finally, the PIC's retention of outside legal counsel to provide advice on the retention of the Company Stock Fund is evidence of thorough consideration. *See Martin v. Feilen,* 965 F.2d 660, 671 (8th Cir.1992); *Sydnor,* 2000 WL 33687953, at *16 ("Securing an independent expert's opinion of a financial advisor or legal counsel is evidence of a thorough investigation."). In sum, the PIC gave reasonable and appropriate consideration to whether or not to retain the Company Stock Fund as an investment option throughout the class period, and therefore U.S. Airways did not breach its fiduciary duties under ERISA in this respect.

Plaintiff also alleges that the PIC violated ERISA's duty of loyalty by failing "to avoid placing themselves in a position where their acts as officers or directors of

the corporation [would] prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *See Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.1982). Specifically, plaintiff alleges that the PIC was unwilling to remove the Company Stock Fund as an investment option or liquidate the Plan's holdings of Group stock for fear of impacting the price of Group stock or sending negative signals to potential creditors. This contention necessarily relies on the conclusion, already rejected, that the PIC had a duty to remove the Company Stock Fund as a Plan investment option. Without a duty to remove the Company Stock Fund, the PIC could not suffer from conflicted loyalties. Moreover, as soon as the Company publicly announced the possibility of a judicial restructuring, the it took the unprecedented step of appointing an independent fiduciary to exercise the Company's fiduciary responsibilities with respect to the Company Stock Fund. And, the fact that the independent fiduciary considered whether to close the Company Stock Fund to participant investments, and elected not to do so until the actual bankruptcy filing, belies the contention that the PIC's retention of the Company Stock Fund was somehow attributable to the PIC's divided loyalties. Thus, U.S. Airways did not breach its duty of loyalty to the Plan or, by extension, to its participants.

### C.

To conclude, the continued offering of the Company Stock Fund as an investment option in the Plan was not a breach of U.S. Airways' ERISA fiduciary duty throughout the class period. This holding rests primarily on two considerations. First, the portfolio management theory, which is accepted in the investment community, and by the Department of Labor and the case law as a sound investment methodology, teaches that an investment in a risky security as part of a diversified portfolio is, in fact, an appropriate means to increase return while minimizing risk. Second, investment vehicles containing company stock are favored by ERISA and fiduciaries are entitled to some latitude when they include them as a single option in an otherwise diversified pool of investment options in a 401(k) plan. Thus, a fiduciary may continue to offer employee stock as an investment option in a 401(k) Plan as long as the fiduciary also provides Plan participants, as here, with: (1) a range of investment options; (2) true and accurate information regarding the risk/return characteristics of those investment options; and (3) the unfettered ability to trade in and out of the various investment options. Compliance with these requirements enables participants to construct a diversified portfolio of investments while participating in the ownership of their employer, and in a plan that allows participants to direct their own investments, that is the extent of the fiduciary's duty under ERISA. It should be noted that because investments in individual securities almost always entail considerable risk, requiring fiduciaries to eliminate an investment option consisting primarily of employee stock simply because it is a very risky investment would contravene Congress' clearly expressed intent to encourage investments in employee stock. Indeed, this negation of Congress' intent would be especially pronounced among young, entrepreneurial companies whose company stock funds are often quite risky investments, but offer participants in a company defined contribution plan the opportunity to reap considerable rewards for their contribution to a young company's success. Accordingly, in the circumstances, U.S. Airways' decision to continue to offer the Company Stock Fund, even given the substantial risk this investment entailed, was an appropriate exercise of its ERISA fiduciary authority.

For these reasons, an appropriate final judgment order will issue in favor of U.S. Airways and against the plaintiff and the class.